## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANGELINE JORDAN,

     Plaintiff,

     vs.                                   Civ. No. 19-591 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

     Defendant.

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff Angeline Jordan's ("Ms. Jordan")
Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 20)
("Motion"), filed January 10, 2020, seeking review of the unfavorable decision of Defendant
Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Ms.
Jordan's claims for Title II disability insurance benefits ("DIB") under 42 U.S.C. §§ 405(g) and
1383(c)(3). The Commissioner filed a response in opposition to the Motion on April 3, 2020
(Doc. 24), and Ms. Jordan filed a reply in support of it on April 22, 2020.  (Doc. 25.)  Having
meticulously reviewed the entire record and the applicable law and being otherwise fully advised
in the premises, the Court FINDS that Ms. Jordan's Motion is well taken and should be
**GRANTED**.

### I.     Background and Procedural History

Ms. Jordan is a forty-nine-year-old high school graduate whose work history includes
educational assistant and substitute teacher, office clerk, and customer service representative.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned
to conduct dispositive proceedings and order the entry of final judgment in this case.  (Doc. 8.)

(Administrative Record ("AR"[2]) 051, 055-56.) She filed an application for DIB on January 8, 2015, alleging a disability onset date of December 21, 2013. (AR 168-69.) She alleged that she was unable to work due to diabetes, pancreatitis, chronic back pain, and severe depression. (AR 201.) Ms. Jordan's date last insured (DLI) was December 31, 2014, at which time she was forty-three years old. (AR 032, 041.)

Medical records indicate that Ms. Jordan was in a car accident around 2010 resulting in a back injury that improved with physical therapy, massage therapy, and chiropractic care. (AR 301.) However, in December 2012, she fell while putting up Christmas lights, and suffered another back injury causing low back pain that radiated down her left leg. (AR 301.) In February 2013, she reestablished care at ABQ Health Partners' Pain Clinic[3], where she was treated by Dr. Julie Muche. (AR 298-301.) At her initial visit, Ms. Jordan reported experiencing pain that "is constant" and "worse with standing, turning or twisting[.]" (AR 301.) She also reported that while she "is usually active with her children"—then ages nineteen, seventeen, and ten—she "cannot even take [her] 10-year-old to football or [mixed martial arts]" and is "[n]ot functioning in her everyday life" due to her constant pain. (AR 301.) Dr. Muche prescribed Ms. Jordan two pain medications and ordered an MRI. (AR 298.) In March and May 2013, Dr. Muche treated Ms. Jordan's "bulging lumbar disc" with epidural steroid injections and continued to prescribe Ms. Jordan a narcotic pain medication. (AR 304-05, 310-12.) On Dr. Muche's referral, Ms. Jordan saw Dr. Mark Crawford in June 2013 for a surgical consultation. (AR 311, 315-21.) Finding that Ms. Jordan has "failed all conservative treatment[,]" Dr. Crawford recommended treating Ms. Jordan's "herniated disc" with a limited decompression and discectomy of the L5-S1 vertebra. (AR 315.) Ms. Jordan did not

---

[2] Citations to "AR" are to the Administrative Record (Doc. 28) that was lodged with the Court on January 28, 2020.

[3] Dr. Muche's note from Ms. Jordan's February 22, 2013 visit states, "Patient returns today after not being seen for over a year in our clinic with complaints of low back pain." (AR 301.)

immediately undergo back surgery due to an intervening surgical ablation to address bleeding she had been experiencing for four months and that caused her "severe anxiety[.]"[4] (AR 332.) Instead, in October 2013, she received another epidural steroid injection from Dr. Muche, who also prescribed a trial of Nucynta, an opioid pain medication, and referred Ms. Jordan for physical therapy. (AR 329-33.) When the combination of injections and pain medications continued to prove ineffective, Ms. Jordan returned to Dr. Crawford, who performed a "[l]umbar decompression, left L5-S1 with excision of herniated disc" on December 11, 2013. (AR 408-09.)

Immediately following surgery, Ms. Jordan reported that she was "doing remarkably well" and was "happy with the outcome." (AR 352, 360.) She continued to take Nucynta to manage her pain and attended physical therapy. (AR 358-60, 362-63.) In May 2014, Dr. Muche returned Ms. Jordan to hydrocodone-acetaminophen to manage her pain and added a prescription for a muscle relaxer (tizanidine) to address her complaint of muscle spasms. (AR 367, 369.) By June 2014, Ms. Jordan was "not functioning very well as her pain is not covered very well." (AR 375.) She reported experiencing "a lot more pain and stiffness" and that her pain medication provided only partial relief. (AR 375-76.) Dr. Muche increased Ms. Jordan's hydrocodone and muscle relaxant dosages and referred her for physical therapy and injections. (AR 373.) Dr. Muche performed another injection in Ms. Jordan's back in August 2014 and added a morphine tablet to her medication regimen. (AR 383-84.) In November 2014, Ms. Jordan reported continuing to experience "constant and severe[,] intense pain" for which massage therapy and acupuncture provided only temporary relief. (AR 392.) Dr. Muche ordered an MRI of Ms. Jordan's thoracic spine and started a trial of topiramate, a medication used to treat neuropathic pain. (AR 388-89.)

---

[4] Ms. Jordan reported to Dr. Muche that she "was trying to take out her endotracheal tube during the surgery and has had severe anxiety since." She also reported that the Zoloft she was prescribed was "helping somewhat." (AR 332.)

In January 2015, Dr. Muche referred Ms. Jordan for a right intercostal nerve block, ordered an MRI of her T-spine, and indicated she would be evaluated for a thoracic epidural injection depending on the results of the MRI. (AR 395.)

Ms. Jordan continued to seek treatment for back pain in 2015 and 2016 with various providers at the Pain Clinic after Dr. Muche left the practice in early 2015. (AR 395, 605-06, 610-11, 616-26.) Ms. Jordan's primary care physician, Dr. Mirta Rodriguez-Lugo,[5] took over Ms. Jordan's medication management in May 2015 and continued to refill her prescriptions for hydrocodone-acetaminophen, topiramate, and tizanidine in 2015 and into early 2016. (AR 395, 549, 552, 556-57, 562, 569.) Other providers continued prescribing Ms. Jordan medications in 2016 and 2017 to treat her complaints of back pain. (AR 581-82, 587-88, 601.) An MRI taken in May 2017 revealed "[s]evere loss of disc space with moderate right paracentral disc bulge and mild bilateral facet arthropathy" at Ms. Jordan's L5-S1 joint, resulting in "[m]ild compression" of Ms. Jordan's right S1 nerve root. (AR 667.) At her administrative hearing before administrative law judge ("ALJ") Michelle K. Lindsay in June 2017, Ms. Jordan testified that she continued to take up to six hydrocodone a day, a muscle relaxer, and topiramate. (AR 047, 057.) She also testified that her back pain "has sent me into . . . a lot of depression" and that she experiences loss of concentration, moodiness, and "a lot of emotional anxiety . . . around people" as side effects of her medications. (AR 058-59.)

Regarding Ms. Jordan's alleged mental impairments, medical records indicate that she was treated by Dr. Rodriguez-Lugo with prescription medications to address complaints of insomnia and anxiety beginning as early as November 2011 and May 2012, respectively (AR 419-20), and

---

[5] In her January 2015 disability report, Ms. Jordan indicated that she had been seeing Dr. Mirta Rodriguez-Lugo since 2006 for treatment of "my diabetes, my pancreatitis, my depression, high blood pressure, insomnia, and skin conditions due to my diabetes." (AR 205.)

continuing well beyond her DLI.[6] (*See* AR 419-20, 431, 454, 458, 462, 465, 488-89, 566.) During the relevant time period of December 2013-December 2014, Ms. Jordan reported experiencing "sleep disturbances" to Dr. Rodriguez-Lugo and continued to take prescription medications for anxiety and insomnia without interruption.[7] (AR 453-84.) In April, June, August, and November 2014, she reported to Dr. Muche that her "mood . . . most nights" was "poor" and that her sleep was either "fair" or "poor." (AR 365, 376, 385, 392.) On June 18, 2014, Dr. Muche noted that "[t]he patient is tearful today as she is frustrated and upset that things are deteriorating rather than improving" with her back. (AR 376.) Dr. Muche referred Ms. Jordan for counseling "[b]ecause of her lack of coping with her pain condition at this time and frustration and depressive symptoms[.]" (AR 373.) In November 2014, Dr. Muche observed that Ms. Jordan "is very tearful today and upset but has not gone to counseling for her chronic pain." (AR 392.) She "[s]trongly encourage[d]" Ms. Jordan to see a counselor at that time. (AR 389.) In January 2015, Dr. Muche noted that Ms. Jordan reported "that she has not had the motivation to get out of the house" and had not been to counseling. (AR 398.) Dr. Muche again encouraged Ms. Jordan to attend counseling "to improve her coping with chronic pain and improve her motivation[.]" (AR 395.)

The ALJ found that through her DLI, Ms. Jordan had the following severe impairments: degenerative disc disease of the lumbar spine, status post lumbar decompression and laminectomy;

---

[6] The record indicates that Dr. Rodriguez-Lugo was Ms. Jordan's primary care physician through February 2016. (*See* AR 566, 575.) Other providers whom Ms. Jordan saw after February 2016 continued to prescribe medications to address her anxiety and insomnia and, eventually, depression. (AR 581, 585-87, 593.) Ms. Jordan testified at her hearing in June 2017 that she continued to take medication for her anxiety. (AR 058.)

[7] A treatment record from May 2015 indicates that Ms. Jordan reported that she had "increased anxiety" and was "no longer on Sertraline[,]" her anti-anxiety medication, at that time but was restarted on Sertraline and additionally prescribed Clonazepam to address her anxiety in May 2015. (AR 488, 493.) There is no additional information in either the May 2015 treatment record or elsewhere in the administrative record indicating for how long Ms. Jordan had not been taking her Sertraline. The record, however, indicates that Dr. Rodriguez-Lugo ordered a refill of Sertraline in July 2014 (AR 465, 467) and shows Sertraline as one of the medications Ms. Jordan was taking in September, October, and December 2014. (AR 473, 478, 483.)

bilateral trochanteric bursitis; sacroiliac joint dysfunction; and diabetes mellitus, poorly controlled. (AR 032.) The ALJ additionally found that "[t]here is objective medical evidence . . . of impairments that are non-severe in that such impairments establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to meet the basic demands of work activity[.]" (AR 033.) The impairments the ALJ found to be "non-severe" were anxiety, depression, and pancreatitis. (AR 033.) Regarding Ms. Jordan's alleged anxiety and depression, the ALJ found that "considered singly and in combination," they caused "no limitation" in Ms. Jordan's ability to adapt or manage herself and only a "mild limitation" in her ability to understand, remember and apply information, interact with others, and concentrate, persist, or maintain pace. (AR 033-34.)

In assessing Ms. Jordan's residual functional capacity (RFC), the ALJ found that Ms. Jordan retains the capacity to perform sedentary work with certain physical limitations and with no mental functional limitations. (AR 036.) Based on the RFC she assessed and the testimony of vocational expert Leslie White, the ALJ found that Ms. Jordan was capable of performing her past relevant work as a customer service representative as of her DLI or, alternatively, that there were other jobs in the national economy—addresser, call out operator, and telephone quotation clerk— that Ms. Jordan could have performed. (AR 040-42.) The ALJ therefore found that Ms. Jordan "was not under a disability . . . at any time from December 21, 2013, the alleged onset date, through December 31, 2014, the date last insured[.]" (AR 042.) Ms. Jordan filed a request for review of the ALJ's decision, which was denied by the Appeals Council. (AR 013-16, 165-66.) Ms. Jordan then appealed to this Court. (Doc. 1.)

## II.   **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In undertaking its review, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2006). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *id.*, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## III.   Discussion

Ms. Jordan raises two issues on appeal. First, she argues that the ALJ breached her duty to develop the record regarding Ms. Jordan's alleged severe mental impairments. (Doc. 20 at 12-17.)

7

According to Ms. Jordan, "the evidence before ALJ Lindsay established that there was a reasonable possibility that Ms. Jordan had severe mental impairments" (Doc. 20 at 13), and the ALJ erred by rendering a disability determination without first re-contacting Ms. Jordan's medical providers and/or ordering a consultative examination to "[c]larify [a]mbiguities" regarding the extent to which Ms. Jordan's anxiety and depression affected her ability to do basic work activities. (Doc. 20 at 12-17.) Second, Ms. Jordan argues that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly account for Ms. Jordan's subjective complaints and reports regarding her symptoms. (Doc. 20 at 18-23.)

The Commissioner counters that "the record before the ALJ was adequately developed for the ALJ to evaluate [Ms. Jordan's] mental conditions within the one-year relevant period between the alleged onset of her disability in December 2013 and her December 31, 2014 date last insured" and that the ALJ thus did not err by neither ordering a psychological consultative examination nor re-contacting Ms. Jordan's providers. (Doc. 24 at 8-16). The Commissioner additionally contends that the ALJ reasonably discounted Ms. Jordan's subjective complaints based on their inconsistency with other evidence. (Doc. 24 at 16-23.)

For the following reasons, the Court concludes that remand is required because the ALJ erred in rendering her disability determination, which is not supported by substantial evidence.

**A.  Applicable Law Regarding the ALJ's Duty to Develop the Record**

"The burden to prove disability in a social security case is on the claimant, and to meet this burden, the claimant must furnish medical and other evidence of the existence of the disability." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004). However, it is also "well established that a Social Security disability hearing is a non-adversarial proceeding, in which the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the

claimant's own version of those facts." *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (quotation marks and citations omitted). "[T]he ALJ is responsible in every case to ensure than an adequate record is developed during the disability hearing consistent with the issues raised[.]" *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (quotation marks and citation omitted). The duty to develop the record "pertains even if the claimant is represented by counsel." *Thompson*, 987 F.2d at 1492. The duty, however, "is *not* unqualified." *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009). "Several preconditions inform an ALJ's duty to develop the administrative record[,]" including whether counsel has identified the issue requiring further development and whether the issue raised is "substantial on its face." *Wall*, 561 F.3d at 1063 (quotation marks and citations omitted). The "starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167. "Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment." *Id.*

"[T]he claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." *Id.* "If she does so, the ALJ's duty to order a consultative examination arises." *Flaherty*, 515 F.3d at 1071 (citing *Hawkins*, 113 F.3d at 1167). Additionally, "where there is a direct conflict in the evidence requiring resolution, . . . or where the medical evidence in the record is inconclusive, . . . a consultative examination is often required for proper resolution of a disability claim." *Hawkins*, 113 F.3d at 1166 (citations omitted). "[T]he ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Id.*

9

at 1169. However, if the claimant fails to adduce evidence of a reasonable possibility that an alleged impairment is "severe," or if substantial evidence supports an ALJ's finding that an alleged condition is "not severe" and causes no functional limitations, the ALJ has no duty to further develop the record as to that condition. *See Flaherty*, 515 F.3d at 1071-72 ("The ALJ was not required to develop the records because Ms. Flaherty failed to adduce evidence of a reasonable possibility that her migraines were a severe impairment."); *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008) (holding that "there was no need to further develop the record because sufficient information existed for the ALJ to make her disability determination").

### B.  Whether the ALJ Breached Her Duty to Develop the Record

#### 1.  Ms. Jordan Adequately Raised the Issue of the Possibility of a Severe Mental Impairment

Ms. Jordan expressly and adequately raised the issue of how a mental condition may impair her ability to work. Beginning with her application for DIB, Ms. Jordan alleged that severe depression, in addition to other conditions, limited her ability to work. (AR 201.) Then, in the function report she completed in April 2015, Ms. Jordan responded to the question, "How do your illnesses, injuries, or conditions limit your ability to work?" by stating, "The pain is to[o] much even with meds, and I can't think straight if the pain is to[o] much to handle. I can't . . . be around a lot of people when I'm in pain with my back." (AR 212.) She also indicated that her ability to "[g]et [a]long with [o]thers" had been affected by her conditions; the only people she spent time with were her "family [at] home" doing things like watching television and talking; and the only place she went on a regular basis was to her son's sports "once a week." (AR 216, 217.) Additionally, in response to the question, "Have you noticed any unusual behavior or fears?" she responded, "Yes[,]" and explained that she has "a lot of anxiety[.]" (AR 218.)

10

The prehearing memorandum submitted by Ms. Jordan's attorney in June 2017, alleged that she suffers from, *inter alia*, severe insomnia, depression, and anxiety disorder. (AR 279-80.) It also noted that she takes prescription medications for anxiety and insomnia and that she "experiences psychiatric symptoms that prevent her from maintaining the alertness, close attention, or coordination required of her past skilled or semiskilled work." (AR 280-81.) At her hearing, Ms. Jordan testified that one of the reasons she could no longer work was that her back pain "sent me into . . . a lot of depression" and that "it was hard to be around people" and "[h]ard to concentrate[.]" (AR 058-59.) Moreover, the medical records indicate that Ms. Jordan had been diagnosed with and was being treated for insomnia and anxiety with prescription medications beginning as early as 2011/2012 and continuing, without interruption, through her DLI. They also establish that during the relevant time period of December 2013 through December 2014, she complained of "sleep disturbances" to Dr. Rodriguez-Lugo on two occasions, and her pain doctor, Dr. Muche, noted that she was "tearful" and showing "depressive symptoms" and described her as being "frustrated and upset that things are deteriorating rather than improving" with her back. (AR 372-76, 388-92.) Indeed, based on Ms. Jordan's presentation in June and November 2014, Dr. Muche "[s]trongly encourage[d]" her to seek counseling to improve her "coping skills" related to her chronic pain. (AR 373, 389.) Dr. Muche again recommended counseling in January 2015 when Ms. Jordan reported that "she has not had the motivation to get out of the house." [8] (AR 395, 398.)

While the record is clear that Ms. Jordan's back-related impairments were the primary cause of her alleged inability to work beginning in December 2013 and the focus of the medical

---

[8] The Court acknowledges that Ms. Jordan's DLI was December 31, 2014. However, the mere fact that evidence dates from after a claimant's DLI does not mean it can be disregarded. Indeed, as the Tenth Circuit has explained, "evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date[.]" *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (alteration, quotation marks, and citation omitted).

treatment she sought, there is more than sufficient evidence in the record to suggest a reasonable possibility that Ms. Jordan suffered from a mental impairment that more than minimally affected her ability to perform basic work-related functions on a sustained basis. It is not merely isolated and unsupported statements by Ms. Jordan that suggest this possibility. Rather, it is the combination of diagnosis by a medical doctor of two conditions indicative of possible mental impairments, the use of prescription medications to treat the diagnosed conditions, reported symptoms that are consistent with the diagnosed conditions and suggest limitations in relevant mental functioning areas, and a treating physician's documented observation of "depressive symptoms" that prompted repeated referrals to counseling during the relevant period. The Court concludes that the record contains sufficient evidence suggesting the existence of a condition that could have a material impact on the disability decision such that further investigation may have been necessary.

To determine whether further investigation was, in fact, necessary here, the Court next considers whether the medical evidence in the record was conclusive as to the effect that Ms. Jordan's mental impairments had on her ability to work and/or whether there was a material conflict in the evidence that required resolution. If the medical evidence was inconclusive or a material conflict existed, further development of the record to assist the ALJ in determining to what extent Ms. Jordan's mental impairments affected her ability to work during the relevant period would have been warranted. *See Hawkins*, 113 F.3d at 1166. If, however, the record was adequately developed and there is substantial evidence supporting the ALJ's disability determination as the Commissioner argues, there is no error in the ALJ's failure to further develop the record. *See Cowan*, 552 F.3d at 1187.

**2. The Record is Insufficient to Support the ALJ's Decision and Should Have Been Further Developed**

The Commissioner contends that substantial evidence supports the ALJ's conclusion that Ms. Jordan "did not have a severe mental impairment and did not experience an[y] functional limitations." (Doc. 24 at 9.) For the following reasons, the Court disagrees.

### a. The ALJ's Reasons for Finding that Ms. Jordan's Mental Impairments are Non-Severe are Legally Inadequate

In applying the special technique required to be used in evaluating mental impairments, *see* 20 C.F.R. § 404.1520a, the ALJ found that Ms. Jordan's "medically determinable mental impairments of anxiety and depression, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe." (AR 033.) The ALJ specifically found that in each of the four broad functional areas she was required to assess—(1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself, *see* 20 C.F.R. § 404.1520a(c)(3)—Ms. Jordan had only a "mild limitation[,]" which generally translates to a finding of non-severity. *See* 20 C.F.R. § 404.1520a(d)(1) (providing that ratings of "none" or "mild" result in a finding that the impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities"). Specifically, and in accordance with the Regulations' requirement that the ALJ's decision "include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c)[,]" 20 C.F.R. § 404.1520a(e)(4), the ALJ made the following findings:

> The first functional area is understanding, remembering, or applying information. In this area, the claimant had a mild limitation. The claimant reports that a side effect of her depression medication is confusion and her anxiety medication affects her memory (Ex. 7E). The claimant's recent and remote memory were noted as intact, even when she was in an abnormal mood from anxiety (Ex. 2F, 84).

> The next functional area is interacting with others. In this area, the claimant had a mild limitation. The claimant alleges that she does not like to be around others (Ex. 9E).
>
> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. The claimant reports that she sometimes finishes what she starts (Ex. 4E and 9E). It was noted that the claimant had no decrease in her concentrating ability when she had an abnormal mood from anxiety (Ex. 2F, 84).
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant had no limitation. The claimant reports she is able to handle stress and changes in her routine ok, but not as well as before (Ex. 4E and 9E).

(AR 033-34.) The ALJ's reasons for finding only "mild limitations" in each of the functional areas are legally inadequate.

As the Regulations recognize, "[a]ssessment of functional limitations is a complex and highly individualized process that requires [the ALJ] to consider multiple issues and *all relevant evidence* to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1) (emphasis added). The ALJ's written decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4). While the ALJ was not required to discuss every piece of evidence in the record, her decision was required to demonstrate that she at least considered all the evidence, including, critically, uncontroverted evidence she chose not to rely upon and any significantly probative evidence she rejected. *See Clifton*, 79 F.3d at 1009-10. The ALJ's decision fails to do so. Instead, each of the findings regarding Ms. Jordan's functional limitations is supported by one or two cherrypicked pieces of evidence and the ALJ fails to account for other evidence of record that tends to undercut each finding. The ALJ's approach not only evinces her failure to comply with the applicable legal standards for evaluating mental impairments

but also renders her findings unsupported by substantial evidence. *See Langley,* 373 F.3d at 1118 (explaining that a decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record" (quotation marks omitted)).

As just one example, the ALJ's finding that Ms. Jordan has only a "mild limitation" in her ability to interact with others cites a single record—Ms. Jordan's December 2015 function report— in support of that assessment. Her decision includes no discussion of the other evidence of record that is probative of whether Ms. Jordan had more than a "mild" limitation in this area of functioning between December 2013 and December 2014. It does not acknowledge, for example, that in April 2015—i.e., much closer in time to Ms. Jordan's DLI—Ms. Jordan reported that her ability to get along with others had been affected by her conditions (AR 217); that she "can't . . . be around a lot of people when I'm in pain with my back" (AR 212); that the only people she spent time with were family members, whom she would see on nights and weekends at her home (AR 216); that the only place she would go on a regular basis was to her son's sports once a week, where she would "take part" by sitting or standing and watching (AR 216); and that she had noticed feeling "a lot of anxiety." (AR 218.) Nor does it acknowledge that Dr. Muche, Ms. Jordan's treating pain doctor, referred Ms. Jordan on three occasions—twice shortly before and once very shortly after her DLI—to counseling after observing "frustration and depressive symptoms" in Ms. Jordan. All this evidence is suggestive of the possibility that Ms. Jordan suffered from more than a "slight abnormality" that caused "no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner[,]" i.e., that Ms. Jordan's mental impairments were severe before her DLI. *See* SSR 96-3p, 1996 WL 374181, at * 1 (Jul. 2, 1996) (providing that "an impairment(s) is considered 'not severe' if it is a slight

abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner").

The ALJ's failure to evince that she (1) applied the correct legal standards in evaluating Ms. Jordan's mental impairments, and (2) considered all the relevant evidence of record in undertaking the "complex" process of evaluating Ms. Jordan's mental impairments—particularly in the absence of medical opinions from either a treating or examining source[9]—leaves the Court unable to agree with the Commissioner that the ALJ's finding that Ms. Jordan's mental impairments were non-severe is supported by substantial evidence.

Nevertheless, an ALJ's error at step two of the sequential evaluation process, *see* 20 C.F.R. § 404.1520(a)(4) (setting forth the five-step evaluation process used to evaluate disability claims), is harmless if the ALJ, based on finding another impairment severe, proceeds to the remaining steps of the sequential evaluation process and assesses limitations—or adequately justifies why no limitations are assessed—for any impairments found to be non-severe at step two. *See Grotendorst v. Astrue*, 370 F. App'x 879, 883-84 (10th Cir. 2010) (unpublished)[10] (concluding that the ALJ erred in finding the claimant's mental impairments "not severe" at step two, noting that "an error at step two of the sequential evaluation process is usually harmless when the ALJ . . . finds another impairment is severe and proceeds to the remaining steps of the evaluation[,]" and holding that the ALJ committed reversible error in that case where she failed to include mental limitations borne out by the evidence in her RFC determination or explain that failure). The Court thus considers whether the ALJ's RFC determination adequately remedies her step-two error.

### b.  The ALJ's RFC is not Supported by Substantial Evidence

---

[9] The Court addresses the issue of medical opinions regarding Ms. Jordan's mental impairments in the next section.

[10] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

In assessing Ms. Jordan's RFC, the ALJ found that Ms. Jordan has certain physical functional limitations but no mental functional limitations. (AR 036.) While the ALJ acknowledged Ms. Jordan's subjective complaints regarding her mental impairments—i.e., that she "alleges her back pain affects her ability to think and makes her irritable, which affects her ability to get along with others" and that "her pain and the side effects of her medication make her not want to leave her home" (AR 036-37)—she found that "[t]he objective evidence does not support the claimant's allegations." (AR 037.) In support of that finding, the ALJ discussed what the medical records show regarding Ms. Jordan's *physical* impairments (i.e., back-related conditions and diabetes), but she failed to either connect that evidence to, or independently discuss, any of the medical evidence reflecting Ms. Jordan's alleged mental impairments. (*See* AR 037-38.) The only evidence the ALJ discussed and that she appears to have relied on in support of the RFC she assessed were the two medical opinions of record from the non-examining state agency consultants who reviewed Ms. Jordan's application at the initial and reconsideration levels.[11,12] (AR 039, 040.) Because the ALJ accorded "great weight" to both opinions (AR 039, 040), and

---

[11] The Court notes that the ALJ's discussion of the RFC also mentions that Ms. Jordan's mother, Maxine Velasquez, opined in her third-party function report that Ms. Jordan's ability to get along with others has been affected due to her impairments, an opinion to which the ALJ accorded "little weight" because Ms. Velasquez "is not familiar with the program requirements." (AR 040.) The Court finds it unnecessary to address the ALJ's handling of the third-party function report but notes that rejecting an opinion—even from a nonmedical source—solely because it came from a person who is "not familiar with the program requirements" fails to comply with the legal standards for weighing opinions in effect when the ALJ rendered her decision. *See* 20 C.F.R. § 404.1527(f) (providing that nonmedical sources' opinions will be considered "using the same factors as listed in paragraph (c)(1) through (c)(6) in this section" and that the ALJ's discussion of the evidence must allow "a subsequent reviewer to follow the adjudicator's reasoning" regarding the weight an opinion was accorded).

[12] The Commissioner contends that the ALJ additionally "considered clinical findings when she evaluated [Ms. Jordan's] mental conditions" at step two. (Doc. 24 at 11.) Not only has the Court already concluded that the ALJ's handling of the evidence at step two was inadequate, but also determinations regarding severity made at step two "are not an RFC assessment" and are insufficient on their own to support an RFC determination, which "requires a more detailed assessment by itemizing various functions contained in the broad categories" used to determine severity at step 2. *See* SSR 96-8p, 1996 WL 374183, at *4 (Jul. 2, 1996). The Court fails to see—and the Commissioner fails to explain—how the ALJ's citation to cherrypicked evidence she relied on to support her step two findings somehow supports her later determination regarding Ms. Jordan's RFC, a different issue requiring a more specific inquiry, where the ALJ herself did not indicate that she relied on the evidence the Commissioner cites in assessing the RFC.

because the Commissioner contends that the opinion rendered at reconsideration, specifically, "supported the ALJ's conclusion that Plaintiff did not have severe mental impairment and did not experience an[y] mental functional limitations" (Doc. 24 at 9), the Court next considers those opinions and the ALJ's treatment thereof.

###   i.   The ALJ Erred in Handling the Medical Opinions Regarding Ms. Jordan's Mental Impairments

The record contains no opinions from any of Ms. Jordan's treating doctors or a consultative examiner. The only medical opinions of record are from the non-examining state agency consultants who reviewed Ms. Jordan's application at the initial and reconsideration levels. (AR 074-82 (reconsideration), 083-91 (initial).) In reviewing Ms. Jordan's claim at the initial level in July 2015, non-examining state agency psychiatrist P. Walls, M.D., found "[a]nxiety [d]isorders" to be a secondary impairment and indicated that the impairment was "[s]evere." (AR 086.) In completing the psychiatric review technique (PRT), Dr. Walls concluded that there was "[i]nsufficient [e]vidence" to determine how Ms. Jordan's anxiety disorder affected each of her relevant mental functional abilities.[13] After noting that the medical records "listed Anxiety as a diagnosis" and indicated that Ms. Jordan had been prescribed an antidepressant, Dr. Walls found that the "[n]otes do not provide details of anxiety symptoms, mental status or functional limitations related to anxiety." (AR 086.) He thus concluded, "Information is insufficient to assess severity of Anxiety at DLI." (AR 086.)

---

[13] At the time Dr. Walls conducted the initial review, the "four broad functional areas" considered in rating a claimant's degree of functional limitation were (1) activities of daily living, (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 505.1520a(c)(3) (2016); *see* 81 Fed. Reg. 66138-01, at 66138 (Sept. 26, 2016) (explaining that the SSA was revising the criteria for evaluating mental impairments with the new rules taking effect on January 17, 2017).

At the reconsideration level in March 2016, non-examining state agency psychologist James Sturgis, Ph.D., documented "[a]nxiety [d]isorders" as a secondary impairment. (AR 079-80.) Unlike Dr. Walls, who found there was insufficient evidence to rate Ms. Jordan's functional limitations in the four areas of functioning, Dr. Sturgis rated the degree of Ms. Jordan's limitations in each area as "[n]one[.]"[14] (AR 079.) In his PRT explanation that supported his findings, Dr. Sturgis summarized the evidence of record as follows:

> [Medical Evidence of Record]
> 2/2013 thru 8/2014 (ABQ H[ealth] P[artners]) Hx Insomnia. DX: Anxiety d/o. Sertraline, Zolpidem, Lunesta.
> Psych: positive for fatigue, anxiety and depression, mood/affect appropriate, no apparent distress. Pt is upset and tearful but has not gone to counseling for her chronic pain.
>
> F[unction] R[eport]
> Clmt cares for her son. Socializes with family. Handles stress/changes 'ok'.

(AR 080.) He then concluded:

> Dx: anxiety. Taking meds for anxiety/insomnia. Clmt declined therapy. [Function Report] does not indicate psych symptoms interfere with [activities of daily living].

(AR 080.) Based on his assessment of the evidence and his findings that Ms. Jordan had no functional limitations in the four broad areas of functioning, Dr. Sturgis concluded that Ms. Jordan's mental impairment was "Non Severe." (AR 079, 080.)

Despite that Dr. Walls and Dr. Sturgis rendered conflicting opinions regarding the severity of Ms. Jordan's mental impairment and the sufficiency of the evidence to render a severity finding, the ALJ accorded "great weight" to both opinions.[15] (AR 039, 40.)  Regarding Dr. Walls' opinion,

---

[14] As for Dr. Walls, the four applicable functional areas in effect at the time of Dr. Sturgis's review were (1) activities of daily living, (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.

[15] The ALJ's decision erroneously states that Dr. Sturgis "examined the existing record at the *initial* determination on March 21, 2016" and that Dr. Walls "reviewed the existing record at the *reconsideration* on July 28, 2015[.]" (AR 039, 40 (emphasis added.) Clearly, the initial determination occurred in July 2015 and was completed by Dr. Walls, and the reconsideration occurred thereafter in March 2016 and was completed by Dr. Sturgis.

the ALJ began by acknowledging that Dr. Walls "opined that the record contained insufficient evidence to assess the severity of the claimant's anxiety." (AR 040.) The ALJ next stated that she was giving Dr. Walls' opinion great weight "because it is consistent with the record as a whole. Aside from noting an abnormal mood but a normal affect when [Ms. Jordan] was anxious, there is very little objective evidence of anxiety beyond a diagnosis and medication prescription[.]" (AR 040.) In support of this statement, the ALJ cited a single page of an exhibit containing 120 pages of medical records in an administrative record containing more than 350 pages of medical records. The record cited is dated May 19, 2015—nearly six months *after* Ms. Jordan's DLI—and documents Ms. Jordan's visit to Dr. Rodriguez-Lugo for medication refills and to address "anxiety and possible UTI." (AR 552-53.) The ALJ's decision contains neither an explanation of the significance of the record cited nor further discussion of Dr. Walls' opinion and the reasons for the weight she accorded it.

Regarding Dr. Sturgis's opinion, the ALJ explained that she gave it "great weight" because "it is supported with an explanation and is consistent with the record as a whole." (AR 039.) She specifically credited Dr. Sturgis's opinion that Ms. Jordan's "psychological impairments were non-severe because she declined therapy and did not allege that her symptoms interfered with her activities of daily living" and noted that "[i]n the claimant's functions reports, she reports feeling anxious or moody, but does not state how her mental impairments affect her activities of daily living." (AR 039.) The ALJ's decision contains no further discussion of Dr. Sturgis's opinion or explanation of the weight accorded to it.

The ALJ's decision fails to offer any explanation that even plausibly reconciles the conflicting conclusions of Dr. Walls and Dr. Sturgis regarding (1) whether there was sufficient evidence to render a determination as to the severity of Ms. Jordan's mental impairment in the first

instance, and (2) the severity or non-severity of Ms. Jordan's mental impairment. The Commissioner, however, proffers that "Dr. Sturgis had the benefit of additional evidence related to the relevant period" and posits that "[b]ased on the additional evidence from the relevant period, Dr. Sturgis concluded that Plaintiff did not have a severe mental impairment and did not experience any mental limitations[.]" (Doc. 24 at 8-9.) There are at least three problems with the Commissioner's explanation.

First, even assuming *arguendo* that the record would support deferring to Dr. Sturgis's conclusion because he "had the benefit of additional evidence[,]" the ALJ did not, in fact, accord greater weight to Dr. Sturgis's opinion, something the Commissioner's explanation fails to account for. Second, the Commissioner may not defend the ALJ's decision on a basis not relied upon by the ALJ herself. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"). Finally, the record in fact belies the Commissioner's contention that Dr. Sturgis's opinion differed from Dr. Walls' because there was something in "the additional evidence from the relevant period" that allowed Dr. Sturgis to conclude that Ms. Jordan's anxiety was non-severe. Dr. Sturgis's own PRT explanation indicates that he relied on medical records only from February 2013 through August 2014. (AR 080.) The medical records relied on by Dr. Sturgis not only were available to Dr. Walls (*compare* AR 076-66, *with* AR 084-85), but also do not cover at least two critical records from the relevant period: Dr. Muche's November 2014 and January 2015[16] treatment records indicating that she continued

---

[16] *See* FN 8.

to believe that Ms. Jordan was in need of counseling.[17] The Commissioner's attempt to defend the ALJ's decision based on Dr. Sturgis's opinions fails as both a matter of fact and a matter of law.

To the extent the ALJ relied on the medical opinions of Dr. Walls and Dr. Sturgis to support her findings that Ms. Jordan's mental impairment was non-severe and that Ms. Jordan has no mental functional limitations, those opinions fail to provide substantial evidence to support the ALJ's RFC assessment.

### ii. No Other Substantial Evidence Supports the ALJ's Finding that Ms. Jordan Had No Mental Functional Limitations as of Her DLI

The Commissioner additionally argues that the ALJ reasonably relied on the fact that Ms. Jordan (1) "had refused to attend therapy[,]" as the Commissioner puts it, and (2) "did not allege [in her function reports] that her mental symptoms interfered with her activities of daily living" to support her findings regarding the severity of and limitations caused by Ms. Jordan's metal impairments. (Doc. 24 at 9-10.) On the record in this case, these reasons are inadequate to support the ALJ's disability determination.

The failure of a person to seek out counseling is not dispositive of whether that person's alleged impairments are severe or cause functional limitations. Severity or non-severity is

---

[17] The Court notes that another aspect of Dr. Sturgis's PRT explanation also tends to suggest that to the extent there was "additional evidence" available to him at reconsideration, it played no role in informing his assessment. While Dr. Sturgis had before him Ms. Jordan's function reports from both April 2015 and December 2015, he referred only to the April 2015 report in discussing the evidence to support his assessment. According to Dr. Sturgis's PRT explanation, Ms. Jordan reported that she "[h]andles stress/changes 'ok'." (AR 080.) It is true that in her April 2015 function report, Ms. Jordan described her ability to handle stress and changes in routine as "OK." (AR 218.) However, in her December 2015 function report, which was available at the reconsideration level, Ms. Jordan indicated that she handles stress and changes in routine "not as well as before." (AR 251.) While not itself dispositive of anything, Dr. Sturgis's reliance on certain records to the exclusion of others—particularly records suggesting a deterioration in Ms. Jordan's functioning—without supporting explanation tends to lessen the weight that should have been accorded to his opinion. *See* 20 C.F.R. § 404.1520a(c)(1) (providing that assessing claimant's degree of functional limitation "requires us to consider multiple issues and *all relevant evidence to obtain a longitudinal picture* of your overall degree of functional limitation" (emphasis added)); 20 C.F.R. § 404.1527(c)(3),(4) (providing that "because nonexamining sources have no examining or treating relationship with you, the weight we will give to their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions" and that "the more consistent a medical opinion is with the record *as a whole*, the more weight we will give to that medical opinion" (emphasis added)).

determined through application of the special technique set forth in 20 C.F.R. § 404.1520a and focuses on a person's degree of limitation in each of the four broad areas of functioning. While a person's refusal or failure to seek out treatment for a claimed impairment may be properly considered in making a disability determination, it is not a basis for finding the claimant's mental impairment to be non-severe. *See Grotendorst*, 370 F. App'x at 883 (stating that "the lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations" and "attempting to require treatment as a precondition for disability would clearly undermined the use of consultative examinations"). Indeed, the ALJ recognized this and, as discussed above, based her finding of non-severity on her function-by-function assessment of Ms. Jordan's limitations in each of the four broad areas.[18]

Regarding Ms. Jordan's purported failure to "allege that her mental symptoms interfered with her activities of daily living" (Doc. 24 at 10), that reason fails both legally and factually. At the time the ALJ rendered her decision, the relevant legal inquiry was not whether Ms. Jordan's mental impairments caused limitations in, *inter alia*, her activities of daily living but rather whether they caused functional limitations in, *inter alia*, her ability to "interact with others[.]" *Compare* 20 C.F.R. § 404.1520a(c)(3) (2016), *with* 20 C.F.R. § 404.1520a(c)(3) (2017). In her April 2015 function report, Ms. Jordan indicated that she "sometimes" has "problems getting along with family, friends, neighbors, or others" because she "can get moody if [her] back is in a lot of pain." (AR 217.) She further explained, "if pain is great[,] can't think [and] makes me moody[.]" (AR

---

[18] Even assuming Ms. Jordan's failure to see a counselor prior to her DLI supports the ALJ's finding of non-severity, the ALJ was nevertheless required to consider and account for *all* impairments—including non-severe ones—in assessing Ms. Jordan's RFC. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including [those] that are not 'severe,' . . . when we assess your residual functional capacity."). In assessing Ms. Jordan's RFC, the ALJ was required to undertake "a more detailed assessment by itemizing various functions contained in the broad categories" that she considered in making her severity finding at step two. *See* SSR 96-8p, 1996 WL 374184, at *4 (Jul. 2, 1996). Her decision fails to demonstrate that she complied with these requirements.

217.) In her December 2015 function report, she stated, "I don't like being around people because I get anxious [and] nervous when my pain starts[,]" and explained that "[t]he depression makes me not want to be out." (AR 250.) The ALJ's finding that Ms. Jordan reported "feeling anxious or moody[] but does not state how her mental impairments affect her activities of daily living" thus not only fails to be supported by the evidence but also tends to further evince that the ALJ failed to apply the correct legal standards and properly consider the evidence of record in reaching her disability determination.

As a final matter, the Court notes that the Commissioner acknowledges Ms. Jordan's allegations in her function reports of anxiety and moodiness but argues that Ms. Jordan "attributed her moodiness to her back pain, not an underlying mental condition[.]" (Doc. 24 at 10-11.) The Commissioner's argument demonstrates the need for further development of the record in this case. Ms. Jordan—a lay person with no medical or legal training—could not have been expected to understand, much less opine as to, the relationship between her physical and mental impairments and the effects of her combined impairments on her ability to meet the basic mental functional demands of work. In light of the complexity of the issues involved, this is precisely the kind of case in which re-contacting the claimant's treating providers and/or ordering a consultative examination could reasonably be expected to be of material assistance to the ALJ. As such—and given (1) the direct conflict between the two medical opinions of record and the ALJ's assignment of "great weight" to both without explaining how the opinions were reconciled, and (2) that the medical evidence of record is inconclusive as to the mental functional limitations caused by Ms. Jordan's mental impairment(s) as of her DLI—the Court concludes that the ALJ committed reversible error by failing to further develop the record before making a disability determination. *See Branum*, 385 F.3d at 1272 ("Because of the lack of information in plaintiff's medical records

24

pertaining to her mental impairment, it was necessary to have plaintiff evaluated by a consulting psychologist.").

### C.  The Court Does Not Reach Ms. Jordan's Other Argument

Because the Court concludes that remand is required as set forth above, the Court will not address Ms. Jordan's other claim of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

### IV.     Conclusion

For the reasons stated above, Ms. Jordan's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 20) is hereby **GRANTED**.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent